# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **LATARSHA C. AUSTIN,** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**MAC-LEAN FOGG COMPANY,** )<br>)<br>Defendant. )<br>)<br>) | Civil Action Number<br>**2:12-cv-04057-AKK** |

## MEMORANDUM OPINION

Latarsha C. Austin pursues this claim against Mac-Lean Fogg Company for sexual harassment, retaliation, and discriminatory discharge based on race and gender under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), and for the torts of outrage and invasion of privacy. Doc. 1 at 6–8. Austin contends that Mac-Lean Fogg discharged her because she rebuffed the sexual advances of her supervisor, Paxton Young, and that although Mac-Lean Fogg ostensibly discharged her due to poor production rates, she actually maintained production rates superior to those of at least one coworker outside her protected class. *Id.* at 5. Mac-Lean Fogg moves to dismiss Austin's claims in their entirety, doc. 19, and the motion is fully briefed and ripe for review, docs. 22, 26,

1

27, and 28. Based on a review of the evidence and the law, the court finds that Austin has presented a prima facie claim of sexual harassment, and consequently Mac-Lean Fogg is not entitled to summary judgment on that matter. However, Austin's Title VII retaliation claim fails because Austin did not engage in protected activity prior to her termination, and therefore no causal link exists between her protected activity and her termination. Similarly, Austin's invasion of privacy claim fails because Young's alleged behavior does not entitle Austin to recovery. Lastly, Austin abandoned her remaining claims by failing to respond to Mac-Lean Fogg's arguments concerning them. For these reasons, except for the sexual harassment claim, Mac-Lean Fogg's motion is due to be granted.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then

shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th

Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II. FACTUAL ALLEGATIONS

The following facts reflect an assessment of the record in the light most favorable to Austin. On May 12, 2012, Austin began working as an Assembler at Mac-Lean Fogg's Pelham plant. Doc. 19-1 at 7. Austin reported directly to Paxton Young. *Id.* at 7–8. Consistent with Mac-Lean Fogg's agreement with the union that represents its Assemblers, new hires must complete a sixty-day probationary period before becoming eligible to join the collective bargaining unit. *Id.* at 7. During the probationary period, supervisors evaluate probationary employees after fifteen, thirty, and forty-five days. *Id.* at 8. Probationary employees who do not meet Mac-Lean Fogg's attendance or work performance standards are discharged before the end of the sixty-day period. *Id.*

As an Assembler, Austin was responsible for assembling metal parts. *Id.* Assemblers work on various types of parts, and each part takes a different amount of time to assemble. *Id.* Accordingly, rather than evaluate Assemblers' performance based on the number of parts they produce, Mac-Lean Fogg evaluates them according to their effectivity rate. *Id.* at 8–9. To calculate an Assembler's effectivity rate, Mac-Lean Fogg divides the number of parts the Assembler

produces in one hour by the amount of time it takes to produce the part.[1] *Id.* at 9. Mac-Lean Fogg expects Assemblers to maintain an effectivity rate of at least eighty percent upon hire, with the long-term goal of improving to one hundred percent. *Id.* at 9. During Austin's employment, Mac-Lean Fogg relied on self-prepared, handwritten reports indicating how many parts an Assembler completed, which each assembler turned into his supervisor at the end of a shift, to calculate effectivity rates. Doc. 26 at 3. The supervisor then inputted each assembler's effectivity rate into Mac-Lean Fogg's computer system. *Id.* at 3–4.

Mac-Lean Fogg's records indicate that Austin struggled to meet production expectations. Doc. 22-7. According to those records, Austin's effectivity rate exceeded eighty percent during only eight of her total twenty-six shifts. Austin disputes the accuracy of these records. *See* doc. 26 at 11 (Austin's response to Mac-Lean Fogg's motion for summary judgment, noting that Austin "has disputed that her scores were recorded fairly"); *see also* doc. 25-1 at 27, 29 (Austin's deposition testimony that Mac-Lean Fogg's records of her effectivity rates differed from her recollection of those rates).

Austin received two performance evaluations from Young during her employment. Doc. 19-1 at 9–12. During the first, on May 30, 2012, she received

---

[1] For example, if a part takes six minutes to assemble, an Assembler who produces ten of the parts within one hour would have an effectivity rate of one hundred percent. Similarly, an Assembler who only produced five of the same parts would have an effectivity rate of fifty percent.

low marks in the "Industriousness" and "Quality of Work" categories, and Young told her she needed to increase her production numbers. *Id.* at 10. The dispute in this case centers primarily on alleged events that occurred during the second evaluation on June 19, 2012. According to Austin, after Young presented her with a poor performance review, he offered to improve her effectivity rates if she would meet him after work for a sexual encounter. Doc. 25-1 at 32–33. When Austin declined, Young told her she would "probably pay" for doing so. *Id*. at 33.[2] Sometime earlier in the week, Young apparently told Austin that she would probably lose her job if she failed to improve her effectivity rates. *Id.* at 32.

Two days after the second review and alleged sexual proposition, Young and Lisa Glander, Mac-Lean Fogg's human resources supervisor, met with Austin and informed her of her termination for failing to meet production and work performance standards.[3] Doc. 19-1 at 12. Although Austin asked to speak privately with Glander, when Young left the room, Austin did not inform Glander of

---

[2] Young denies propositioning Austin. Doc. 22-11 at 7. The records associated with Austin's second review indicate that she again received low scores in the "Industriousness" and "Quality of Work" categories and notes that Austin was "[s]till having trouble with the production of parts." Doc. 22-8 at 2.

[3] Young, Glander, and Kerry Smitherman, Pelham plant superintendent, each testified that they met on June 19, 2012, before Austin's second performance review, and Smitherman indicated that he planned to discharge Austin because her production rates failed to meet expectations. Docs. 19-2 at 3–4; 22-9 at 4; 22-11 at 5–6. Young and Glander testified that they did not discharge Austin until June 21, 2012 because Glander was out of the office until that day. Docs. 19-2 at 4; 22-11 at 6. Young also testified that he conducted Austin's second performance evaluation on June 19, 2012, even though Smitherman already had decided to discharge her, because Austin had requested the review and Glander had instructed him to do so. *Id.*

Young's offer to change her production scores in exchange for sexual favors. *Id*. Instead, Austin waited until the next day to notify Mac-Lean Fogg about Young's harassment by first contacting Glander via telephone,[4] doc. 25-1 at 38–39, and then later that same day reporting Young's harassment to Mac-Lean Fogg's corporate headquarters in Illinois, doc. 19-1 at 13, as well as to Mac-Lean Fogg's Global Compliance hotline, doc. 25-1 at 38–39. The following day, Austin faxed a written account of Young's harassment to the Pelham plant's human resources department. Doc. 19-1 at 13. Mac-Lean Fogg investigated Austin's allegations, but ultimately found them to be unsubstantiated. *Id*. at 14. While Mac-Lean Fogg conducted its investigation, Austin filed a charge of discrimination with the Equal Employment Opportunity Commission, and subsequently filed this lawsuit. Doc. 1 at 1–2.

## III. ANALYSIS

Austin brings claims under Title VII for sexual harassment, retaliation, and discriminatory discharge on the basis of race and gender, and under Alabama law for invasion of privacy and outrage. Mac-Lean Fogg contends it is due summary judgment on all of Austin's claims. The court will address each claim in turn.

    *A. Sexual Harassment*

---

[4] Austin testified that she unsuccessfully tried to contact Glander by telephone to report Young's harassment on June 20, 2012, before her termination. Doc. 25-1 at 33–34.

> To establish a prima facie case of sexual harassment under Title VII,
>
> a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists."

*Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999); *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 508 n. 7 (11th Cir.2000)). The Eleventh Circuit has referred to these elements as the "*Mendoza* factors." *See, e.g.*, *Johnson*, 234 F.3d at 508 n. 7. Mac-Lean Fogg contends that Austin fails to meet her burden with regards to the fourth and fifth *Mendoza* factors. Doc. 19-1 at 24–27.

There are two ways in which sexual harassment can rise to a Title VII violation. "One way is if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action[5] being taken against her." *Hulsey*, 367 F.3d at 1245. "As defined by the Supreme Court, a tangible employment action is 'a significant hiring, firing, failing to promote, reassignment

---

[5] Historically, many courts "used the term 'quid pro quo' to describe situations where a benefit of employment was tied to a demand for sexual favors." *Hulsey*, 367 F.3d at 1245 n. 4. However, in *Burlington Industries, Inc. v. Ellerth*, the Supreme Court indicated that the term should no longer be used when determining if an employer is liable under Title VII. 524 U.S. 742, 753–54 (1998). Consequently, the Eleventh Circuit uses the phrase "'tangible employment action' to refer to harassment that culminates in a discharge, demotion, or undesirable reassignment." *Hulsey*, 367 F.3d at 1245 n. 4.

8

with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id*. at 1245 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures." *Id*. The other way sexual harassment can "violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change . . . in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment." *Id*. (citing *Burlington Indus.*, 524 U.S. at 754).

This circuit has clearly stated that district courts must evaluate Title VII liability according to the *Mendoza* factors regardless of whether a plaintiff premises that liability on a tangible employment action theory or a hostile work environment theory. *See Johnson*, 234 F.3d at 508 n. 7 (stating that because the court "[s]ee[s] no important distinction between a prima facie case under quid pro quo as opposed to hostile environment claims, we will apply the Mendoza factors to [the plaintiff's] claims, irrespective of the terms 'quid pro quo' and 'hostile environment'"); *see also Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 2000 (11th Cir. 2001) (noting that "[a]lthough the elements for a prima facie case for these two kinds of claims formerly were analyzed under slightly varying tests,

this court has indicated a willingness to abandon the distinction") (citing *Johnson*, 234 F.3d at 508 n. 7). Nonetheless, there is a crucial difference regarding the application of the fourth *Mendoza* factor, i.e. whether "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," *Hulsey*, 367 F.3d at 1244 (citing *Mendoza*, 195 F.3d at 1245), depending on whether a plaintiff is proceeding under a hostile work environment theory or a tangible employment action theory: "[I]f a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of 'severe or pervasive.'" *Johnson*, 234 F.3d at 508 n. 7. Consequently, when, as here, a plaintiff alleges liability for sexual harassment based on a tangible employment action theory, whether she satisfies the fourth and fifth *Mendoza* factor collapses into one inquiry: whether there is a basis for holding the employer liable because a supervisor took tangible employment action against the plaintiff for failing to comply with the supervisor's sexual demands. Whether the supervisor's alleged harassment was of a frequency, degree, and nature that would qualify as 'severe

and pervasive'—as Mac-Lean Fogg contends Young's does not[6]—is irrelevant.[7]

Austin has met her burden in this case. While Young, Smitherman, and Glander each testified that Smitherman alone made the decision to discharge Austin, *see* docs. 22-2 at 3–4; 22-9 at 4; 22-11 at 4, in its answer to Austin's first set of interrogatories, responding to the question "who was involved *in the decision* to discharge [Austin]" (emphasis added), Mac-Lean Fogg stated that "[t]he individuals involved in terminating [Austin's] employment include Paxton Young and Lisa Glander." Doc. 27-2 at 6. Although in its reply brief, Mac-Lean Fogg attempts to backpedal by stating that "Lisa Glander and Young were 'involved in terminating [Austin's] employment,' because they were the individuals who met with [Austin] on June 21, 2012 to inform [Austin] of her termination" and that "[t]he record is clear that neither Young nor Glander had

---

[6] The court notes that the cases Mac-Lean Fogg cites in support of its contention that Austin's sexual harassment claim fails because Young's alleged harassment was not 'severe and pervasive' are cases in which the plaintiff based liability on a hostile work environment theory, not a tangible employment action theory. *See* Doc. 19-1 at 21–23.

[7] *Hulsey*, 367 F.3d at 1246–49, provides a good illustration of the difference between the application of the fourth *Mendoza* factor to a tangible employment action theory and its application to a hostile work environment theory. In *Hulsey*, the plaintiff contended that the defendant was liable to her based on both theories. *Id*. at 1245. Only when analyzing whether the defendant was liable based on a hostile work environment theory did the court consider whether the wrongdoer's actions were of a frequency, degree, and nature that would qualify as 'severe and pervasive.' *Id*. Additionally, the Eleventh Circuit has described the difference between the two theories of liability as follows: "To prove sexual harassment in violation of Title VII, a plaintiff may rely on one of two theories. Under the first theory, the plaintiff must prove that the harassment culminated in a 'tangible employment action' against her. Under the second or 'hostile work environment' theory, the plaintiff must prove that she suffered 'severe or pervasive conduct.'" *Cotton v. Cracker Barrel Old Country Store*, 434 F.3d 1227, 1231 (11th Cir. 2006).

authority to fire [Austin] and that Smitherman made the ultimate decision," doc. 28 at 8 (citations omitted), the court reminds Mac-Lean Fogg that "[s]tatements by counsel in briefs are *not* evidence," *Skyline Corp. v. Nat'l Labor Relations Bd.*, 613 F.2d 1328, 1337 (5th Cir. 1980) (emphasis added). Critically, however, Mac-Lean Fogg's admission in its response to Austin's interrogatories is sufficient to create a question for a jury to resolve regarding whether Young's involvement means he played an actual role in Austin's discharge or, as Mac-Lean Fogg now contends, his involvement consisted solely of communicating the decision to Austin.

 Moreover, even if Young was not actually a decision-maker, in this circuit, "a 'cat's paw' theory of recovery may apply when a biased actor recommends that an adverse employment action be taken against an employee, but the biased actor is not the ultimate decision-maker." *Williamson v. Adventist Health Sys./Sunbelt. Inc.*, 372 F. App'x 936, 938 (11th Cir. 2010) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir.1999)). Although Mac-Lean Fogg insists that Smitherman alone decided to terminate Austin's employment, the record indicates that he sought out Young and Glander's opinions. *See* doc. 22-9 at 4 (Smitherman's testimony that "[s]ometime in early June 2012, [he] met with . . . Young to discuss . . . Austin's performance"); doc. 22-2 at 4 (Glander's testimony that at the alleged June 19, 2012 meeting where Smitherman announced

his intention to discharge Austin, he asked Glander if she agreed with his decision). Additionally, Smitherman testified that he decided to terminate Austin's employment solely because of her inability to achieve effectivity rates that met Mac-Lean Fogg's production expectations. Doc. 22-9 at 6. This testimony is critical because Austin contests the accuracy of Mac-Lean Fogg's records documenting her effectivity rates, *see* doc 26 at 11; doc. 25-1 at 27, 29, and seems to argue that Young tampered with them[8], *see* doc. 26 at 11–15. Needless to say, if a jury believes either than Young influenced Smitherman's decision based on discriminatory animus or that Young tampered with Austin's production numbers, Mac-Lean Fogg could be liable to Austin based on a cat's paw theory of recovery.

In the final analysis, while the record does not overflow with evidence supporting Austin's claim, it does contain sufficient evidence to create an issue of material fact as to whether Young took adverse employment action against Austin or at least influenced Smitherman's decision in a manner that could render Mac-

---

[8] Mac-Lean Fogg could not produce the handwritten reports that Austin submitted to Young at the end of each shift and that were the basis of her effectivity ratings because they were "discarded in accordance with [Mac-Lean Fogg's] regular business practices." Doc. 28 at 10. Austin contends that Mac-Lean Fogg's "failure to preserve [Austin's] handwritten notes entitles [Austin] to an inference that their contents would have undermined [Mac-Lean Fogg's] contention that [Austin] was not meeting expectations with regard to productivity scores." Doc. 26 at 12. However, "[i]n this circuit, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (citing *Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir.1975)). There is no evidence in the record that calls Mac-Lean Fogg's claim that it disposed of the records in accordance with its normal practices into question or that supports the notion that it tampered with them. Consequently, the court declines to draw an adverse inference in Austin's favor.

Lean Fogg liable to Austin.[9] Consequently, Mac-Lean Fogg's motion for summary judgment on Austin's sexual harassment claim is due to be denied.[10]

*B. Retaliation*

"To make a prima facie showing of a retaliation claim [under Title VII], a plaintiff must demonstrate that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the subsequent materially adverse employment action." *Brush v. Sears Holding Corp.*, 466 F. App'x 781, 786 (11th Cir. 2012) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212 (11th Cir.2008)). A review of the record indicates that the only protected activity Austin

---

[9] Mac-Lean Fogg argues that Young's alleged harassment did not result in a tangible employment action because Smitherman decided to discharge Austin before Young allegedly propositioned her. Doc. 19-1 at 27. Therefore, it contends that Austin can only proceed on a hostile-work-environment theory of recovery, and consequently that it is entitled to a *Faragher-Ellerth* defense. However, as explained above, Austin has presented a prima facie case of sexual harassment based on a tangible employment action theory. Consequently, granting summary judgment based on a *Faragher-Ellerth* defense would be improper. *See Hulsey*, 367 F.3d at 1246, 1247 (stating that the *Faragher-Ellerth* defense "applies only to employer liability based upon a hostile environment theory. It has no effect upon employer liability based upon a tangible employment action theory. . . . The *Faragher-Ellerth* affirmative defense is irrelevant to the tangible employment action theory of recovery") (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)).

[10] The court notes that while Mac-Lean Fogg proffers a legitimate, nondiscriminatory reason for Austin's termination, namely that she failed to meet its performance expectations, and the record contains evidence supporting Mac-Lean Fogg's contention, in this circuit, the *McDonnell Douglas-Burdine* burden-shifting framework is not applicable to sexual harassment claims: "[w]e are unwilling to read the *McDonnell Douglas-Burdine* framework into non-retaliation sexual harassment cases at this point. These types of cases have evolved quite separately from other Title VII cases, and applying a burden-shifting analysis to them would be a departure from precedent." *Johnson*, 234 F.3d at 511 (citing *Henson v. City of Dundee*, 682 F.2d 897, 905 n. 11 (11th Cir.1982)).

engaged in occurred when she reported Young's harassment to Glander, Mac-Lean Fogg's corporate headquarters, and Mac-Lean Fogg's Global compliance hotline *after* her discharge.[11] While Austin testified that she attempted to contact Glander the day before her discharge, doc. 25-1 at 33–34, it is undisputed that she did not contact Glander or any other Mac-Lean Fogg representatives successfully until the day after her termination. *See* doc. 25-1 at 38–39; doc. 19-1 at 13. Consequently, there was no causal link between Austin's protected activity and her termination. *See Myers v. Cent. Fla. Invs., Inc.*, 237 F. App'x 452, 457 (11th Cir. 2007) (finding no causal link between plaintiff's protected actions and her discharge because the defendant decided to discharge the plaintiff before she engaged in protected activity). Because Austin fails to establish a prima facie case, Mac-Lean

---

[11] Austin contends that "her refusal of Young's advances before her termination was protected activity." Doc. 26 at 16. Title VII's anti-retaliation provision prohibits employers from retaliating against an employee who "oppose[s] any practice made an unlawful employment practice by this subchapter, or . . . ma[kes] a charge, testifie[s], assist[s], or participate[s] in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 2000e-3(a). The two clauses of this provision are known as the "opposition clause" and the "participation clause." *Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009). While the opposition clause leaves the term "oppose" undefined, courts have generally viewed an employee as engaging in protected opposition when she voices concern about or resistance to violations of Title VII. *See Crawford*, 555 U.S. at 276 (stating that "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity" (citation omitted) (internal quotation marks omitted); *see also id.* at 273 (describing Title VII's anti-retaliation provision generally as "forbid[ding] retaliation by employers against employees who report workplace race or gender discrimination"). Austin has provided no support for her contention that by rebuffing Young, she engaged in protected activity, and in the absence of any authority, binding or otherwise, that could serve as a basis for such a finding, the court declines to expand the scope of the opposition clause as Austin suggests.

Fogg's motion for summary judgment on her retaliation claim is due to be granted.

*C. Invasion of Privacy*

Austin seems to contend that by asking her to meet him after work for a sexual encounter, Young committed the tort of invasion of privacy, for which Mac-Lean Fogg can be held vicariously liable. Doc. 1 at 8; doc. 26 at 16. Alabama law defines the tort of invasion of privacy as "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIssac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986). However, the Alabama Supreme Court has noted that "[e]ven the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage as to lead to liability" for the tort of invasion of privacy. *Id.* at 152 (citing *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 124 (Ala. 1985); W. Prosser, *Law of Torts*, 54–55 (4th ed. 1971)). Additionally, the court notes that Alabama courts have generally required invasion of privacy claims to allege both ongoing, persistent verbal harassment and unwanted physical contact. *See, e.g.*, *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (substantial evidence supported lower court's finding that defendant committed an invasion of privacy when the plaintiff presented evidence that the defendant repeatedly touched her in a manner that was unwelcome and with sexual overtones, "made several lewd comments[,] asked [the plaintiff] to

meet him outside of work for other than business purposes[,] . . . [and] looked up [the plaintiff's] skirt on more than one occasion"); *Phillips v. Smalley Maint. Servs., Inc.,* 435 So. 2d 705, 711 (Ala. 1983) (finding that the facts of the case supported an invasion of privacy claim when the plaintiff testified that the defendant called her into his office, locked the door, and interrogated her about her sexual relationship with her husband, repeatedly demanded sexual favors from her, reacted violently when she refused, "[o]n one occasion struck her across the buttocks with his hand[, and o]n still another occasion, . . . began papering his office window, thus obscuring the view of those in the surrounding area, in pursuit of what he hoped would be the consummation of lurid propositions to [the p]laintiff"); *Cunningham v. Dabbs*, 703 So. 2d 979, 980–81, 982 (Ala. Civ. App. 1997) (finding that a reasonable jury could conclude the defendant intruded on the plaintiff's privacy when the uncontested evidence showed that the defendant "frequently rubbed [the plaintiff's] shoulders and repeatedly made lewd and suggestive comments to her, including suggestions that they have sex" and on one occasion "leaned over her as if he were going to whisper something to her and stuck his tongue in her ear"). Guided by these cases, and in the absence of any support for Austin's contention that a single sexual proposition can serve as the basis for an invasion of privacy claim, the court finds that no reasonable jury could find Young liable for the tort of invasion of privacy. Consequently, Mac-Lean

Fogg's motion for summary judgment on Austin's invasion of privacy claim is due to be granted. *See Alfa Life Ins. Corp. v. Jackson*, 906 So. 2d 143, 155 (Ala. 2005) (stating that "the dismissal of the tort claims against the agent . . . exonerated the principal . . . from liability for those alleged torts").

*C. Discriminatory Discharge and Outrage*

Although Austin's complaint raises claims of discriminatory discharge on the basis of race and gender and outrage, doc. 1 at 6–7, Austin failed to address Mac-Lean Fogg's arguments concerning those claims in her response to its motion for summary judgment. Consequently, she has abandoned those claims and Mac-Lean Fogg is entitled to summary judgment on them.[12] *See e.g.*, *Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n. 2 (11th Cir. 2009) (finding that the plaintiff waived claims he did not address in his response to the defendant's motion for summary judgment) (citing *Transamerica Leasing, Inc. v. Inst. Of London Underwriters*, 267 F.3d 1303, 1308 n. 1 (11th Cir. 2001)). Alternatively, the claims also fail because Austin failed to establish that racial gender animus motivated her discharge or that the alleged proposition rises to the level necessary to sustain an outrage claim under Alabama law.

---

[12] Additionally, Austin expressly waived her racial discrimination claim during her deposition: "Q. Are you claiming that you were discriminated in this lawsuit because of your race, African-American? A. No. Q. It's only because of your gender and retaliation? A. Yes." Doc. 25-1 at 43.

## IV. CONCLUSION

For the reasons fully explained above, Mac-Lean Fogg's motion for summary judgment is due to be granted in part. Austin has presented a prima facie case of sexual harassment, and consequently Mac-Lean Fogg's motion for summary judgment on Austin's sexual harassment claim is due to be denied. However, because Austin has failed to establish a causal connection between any protected activity and her termination, Mac-Lean Fogg's motion for summary judgment on Austin's retaliation claim is due to be granted. Likewise, Austin has failed to allege facts that are sufficient to support an invasion of privacy claim under Alabama law, and Mac-Lean Fogg's motion for summary judgment on that claim also is due to be granted. Finally, Austin abandoned her discriminatory discharge and outrage claims, so Mac-Lean Fogg's motion to dismiss them is due to be granted as well. The court will enter a separate order consistent with this opinion.

Done this 25th day of Febraury, 2014.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE